Case number 23-1227, et al. Cage Ranch Solar, LLC and Cage Ranch Solar II, LLC Petitioners versus Federal Energy Regulatory Commission. Mr. Ticey for the petitioners, Ms. Gell for the respondent, Mr. Vignette for the intervener. Mr. Teske, good morning. May it please the court. I'd like to reserve 3 minutes for rebuttal, please. A fundamental methodological flaw in Southwest's testing process inflated the costs Cage Ranch owed for interconnecting to the Southwest grid by hundreds of millions of dollars. Southwest assigns to new generators the costs for grid upgrades that would not be necessary but for those generators' connections. Can I ask you a question about standing counsel? Sure. So, it seems to me that although your client was assessed $311 million in costs, it voluntarily withdrew from the interconnection process. So, it was not financially injured by that assessment. And I guess my question is how that voluntary withdrawal from the interconnection process affects standing. Because given that there's no economic harm because of the withdrawal, the only harm it seems to me is that your client lost its place in the queue. And if that's the harm. Then we have both a causation and a redress ability problem because the causation of losing your place in the queue was not the mistakes in the. Studies it was the withdrawal. Of your client by failing to pay the deposit it needed to pay. And then there's also redress ability problem because fixing. The problems in the interconnection study does not is not redressed by putting you back in the queue. The queue question relies on a different 4 part. Test, so why does your client have standing to challenge the problems with the study? Sure, your honor, there's a lot in there, so let me take it piece by piece. And if I forget anything, I'm sure you'll remind me. But 1st of all, we have standing. We've been injured by this process. We were kicked out of the queue. It was not a voluntary withdrawal and it's a bit of terminology, but we did not pay the fee that was not a voluntary choice. And it was a voluntary choice not to pay it. But as part of this dispute resolution process, we filed a complaint. You sought a waiver of that process. So it was not a voluntary withdrawal in the sense that we did not want to be in the queue. We wanted to remain in the queue. We just wanted to pay the correct amount. So, I think we're clearly injured by that process. We, these are very valuable. You're you're by I'm just trying to be more precise by being removed from the queue. When we did not want to be removed from the queue, but if you're. If your argument hinges on being removed from the queue, it just seems to me that. It's because you didn't pay the deposit. If you want to remain in the queue, you could have pay the deposit and remain in the queue. It's isn't this a self inflicted injury as opposed to 1 that was inflicted? I guess there's a finding by. By by Ferk and his decision that the cause of the removal from the queue was not the process. It was. Your voluntary decision not to pay the deposit to stay in the queue. Your honor, I mean, just to be clear, we moved, we challenged the process. We said, you're asking us to post 60Million dollars in at risk security that we will lose. If we later withdraw from from this process based on a study process. That is inherently flawed at the same time. We asked the commission. Well, 1st, we asked so, well, yeah, we have the commission to essentially excuse the deposit requirement. If this court were to agree with us on those points, that's clearly redressable. The court would say. Okay. Well, you can't rely on us ruling in your favor on the. On the waiver issue in order to establish standing on the study issue, because you have to prove standing for each claim independently. Right? So, just looking at your claim, challenging the study. It seems to me that your voluntary withdrawal really changes the standing analysis. And if you had a problem with the rules, the way this works, it seems like you should have. Tried to amend the tariff or whatever the procedures are, but you took a gamble and said, we won't keep our place in the queue the way the rules require us to do it. And instead, we'll challenge and ask for a waiver that there's a risk in that. Because you might not get the waiver to me. That's a business decision. There was a risk on both ends. Your honor, by not paying the deposit. We also, if we lose this case, we are now out of the queue, but there's lots of precedent in this court as well as with. Uh, let me start with the precedent for can restore queue positions. That's very clear. There's no question that they can. It's just you're not entitled to it. And so when you made the decision. Not to stay in the queue by paying your deposit, you were taking a risk. I don't know why you say we're not entitled to it on 351 note. 45. you made a 4 part test in order to to get back into the queue. Once you didn't pay your waiver. That's all I'm saying. Correct. And the only you are taking a gamble that you could meet the 4 part test. Correct. We believe we do meet the 4 part test. No, I understand. But I also want to say that even putting a side waiver, your honor has equitable discretion to restore us to our queue position. I totally understand that. I totally understand that. But I'm just saying, in terms of standing, you can't rely on. Telling us you're going to win on your waiver argument. That that you can get that reversed in order to establish standing. On your study challenge question, you have to establish standing independently. Your honor, even if we had not challenged the waiver finding itself, if we only challenge the methodological problem. If we would prevail on that, and the court were to vacate folks order and remand would still have discretion regardless of the waiver. I'm sorry. If you prevailed on your study. Challenge you're out of the process right now. Correct so how does this redress your injury? You're trying to get back into the queue because we. The, because we were injured by the removal from the queue. We, I'm just saying that that injury isn't related to the study problems that you're you've identified. You want to say there are all these mistakes in the study. I think if you're right, that doesn't get you back in the queue. I think they're bound up together. Your honor. And in fact, that's the way for briefed. It's the way Southwest briefed it. They essentially said, look at 444. This is what said below because cage Rance has failed to show the phase 2 studied effective because of that. Now, I'm quoting. Thus, we thus continue to find that's cage ranges argument that a concrete problem exists based on alleged effectiveness is unpersuasive parts of that test were briefed. And so we can rely on any. Parts of it, like, we're not only relied on 1 and I think under principles, this court. I'm just talking about standing here and we have an independent. Duty to look at standing and we don't have to rely on what. Said, I'm just trying to understand what you're what your injury is, which I think it's being kicked out of the queue. And then how is. If we find that you're correct about the study problems, how does that redress you being kicked out of the queue? Well, because in that situation, you would vacate the order below. That said that the study process was fine. Remanded back to and then would decide on the proper remedy and I would say that if you look at page 351 note, 45, we cite about half a dozen cases where in similar circumstances, restores parties to the queue after a study process has been proven to conflict with the federal power act. Or with cost causation principles, I'd also point out that the tariffs still have discretion though. Yes. Yes. Your honor. And in fact, even if we had not, even if we had not challenged the waiver of our queue position, they'd still would have discretion to do. So, and that's the reason is because has brought equitable discretion. Number 1, when there's a federal power violation, but number 2, the tariff itself section 3.7, explicitly contemplates that a tariff customer who disputes with draw and is removed can be can be resolved. And I'm quoting again tariff 3.7. it says, once a customer is removed from the applicable queue, they are removed from the applicable queue position until such time that the outcome of dispute resolution would restore its position. So, again, we have now engaged in that dispute resolution process. We've challenged the finding at under the tariff itself. We are entitled to be restored to our queue position if we were to prove our federal power act violation. So, I'm happy to answer any other questions on that, but if not, I'd like to turn to them to the merits and I, and I think that the main issue, and I think the simplest and most straightforward way to resolve this case is for the court to conclude that. The Southwest simply did not test for, but for causation, they looked at the grid at a particular snapshot in time with our. With our proposed connection as part of that grid, but it was not a, but for causation test, because they did not isolate the variable of our incremental impact. Instead, they added to the testing model 2. Variables simultaneously number 1 cage ranchers group addition and number 2, various contingencies. I didn't hear you. What's number 1 number 1 was the addition of our group or cluster. Right? And number 2 was various contingencies. And those are things like the catastrophic loss of the transmission line. In order to evaluate the grid under stress, but that methodology simply cannot show under cost causation principles that cage ranch. Caused the need for the upgrades for all Southwest knows the same stress testing. Could have caused the grid model to fail, even if cage ranch never connected. And in fact, I think if you look at page 321, this is Southwest answer. They expressly admit, they say, we've never claimed that there were no non convergences arising from contingencies in the pre transfer case. They come out and set it. So I don't think there's any dispute that. They don't even take the position that there were that there were potentially not convergences. Okay, so so I'm not an expert in any of these issues, and it just seems to me that there was a finding that or tell me if this is true or not that Southwest just used. The process and the analysis that they've always used to determine whether or not there were non convergences arising from contingencies in the pre transfer case. Which is consistent with their tariff, and it seems to me that if you wanted to challenge the process that it always uses, you're supposed to try to get them to amend their tariff as opposed to. Coming in and just criticizing this process. Sort of in a, in a single application. Well, your honor, we're not challenging the tariff. We don't think that. The tariff requires them to test in this. You know, odd way again, this court requires under the cost causation principle that. The upgrade costs that were assigned are those that are necessary that would not be necessary, but for our interconnection, the tariff doesn't say anything about that doesn't dispute that. Right? I do agree that this would upset some of the internal manuals. Some of the internal man. Well, not even upset. I'm just saying the internal manuals don't require. Contingency testing in the non trend in the, in the pre transfer case, but. They don't, they don't bar it either. There's a lot of discretion in the way. Some of these manuals are actually carrying that in all of their future interconnection studies. They need to do pre transfer testing. Your honor, I mean, certainly, if the argument is preserved, that's very uncomfortable, like, telling for how to do pre transfer, how to do interconnection studies and Southwest. I mean, it's not unusual. I think there's evidence in the records undisputed that mid continent or my. So does this does this exact testing and again, I just want to focus on the exact reason why it's so, but I think you're asking us to rule that they have to do this in every interconnection study or it will not. Comport with the cost. Yeah, I'm asking you to tell them that in this, this situation, we're not experts in energy law. That just makes me uncomfortable. Well, I don't think this is a complicated question of energy law. At least the primary submission we're making today. Your honor. We think it's more of a straightforward scientific or engineering, or even a common sense. We also aren't experts in engineering. Well, fair enough. Just just say common sense. If we want to test for a variable. If we add, if we change 2 things, we don't know which of the 2 things. We need a control group, and then we add an experimental experimental group. You want the control group to be identical in every respect except for the 1 variable. You're changing in this situation. The 1 variable you're testing is what is page ranch causing to the grid. And that's not what they do to be very clear. What they do is they take a bait. They start with a base case. The base case is derived from the regional training transmission planning process. That's just looking at what happens in a particular time. Say 2021 was the was the base case for our cluster. What they did was that they took that then they made various adjustments to it, because according to Southwest, the grid is constantly changing. That's on the Southwest brief 23 and 323. they say they make a bunch of adjustments to the adjustments. We're just everybody who is ahead of you in the queue. They also do that. That's what I'm getting to. So they start with the regional transmission process. Then they make adjustments. That's Southwest brief 23 and 323. then then they add all the higher Q. generators. Then they add us, then they test for contingencies and they do things like say, well, what happens if we catastrophically lose a transmission line? What happens to the grid then and then what happens in the middle of summer? If we do that in the middle of winter, if we do that, that's when they run those tests and then they say, oh, look, the grid failed, but they don't know. And they especially admit they have no idea if that same problem would have occurred. Immediately before we were added or in the base case, or even, I mean, we think we're saying that the problem could could arise in the pre transfer scenario and not necessarily in the 3rd scenario. Absolutely. We think it could arise in the pre transfer scenario. We think it could arise in the base case and we think there's evidence, even in the regional transmission process, but I don't think you need to even reach that because I think the flaw is more fundamental. It's simply, if you're going to test for, but for causation, you actually have to test for, but for causation, you can't just look at the grid at a particular snapshot in time, run a bunch of contingencies and say, well, we're going to, we're going to put all the costs on on your client. I'm happy to answer additional questions on that point or or any others, or I can save the balance of my time. What do you understand to be the relationship between the regulatory. Standard of, but for causation. And the statutory gloss principle of cost causation. Are they the same different? I want to make sure I understand your question properly. But for cause versus. Cost causation, I think what this court has said is that they are the same. I'm sorry, not the same, but they're closely related. And essentially, cost causation requires at least a rough approximation of the costs that you're in this context, the cost that your connection required, and it also, but it's not purely, but for, because it also requires looking at the benefits derived. I think that's the distinction the case law bears out. So there's both a. Burden and a benefit inquiry. But again, I think the key fact here is that you actually need to be able to test for that incremental impact of your generation. If this was a case where they had actually performed the proper testing and we were assigned some costs. We could not come in here and quibble about, well, it should have been a tiny bit higher. It's going to be lower. They just need to know. But here, they just don't know. Were those problems already in the grid before we were added or was it our addition? And perhaps it would have been if they perform the tests as Midcontinent does, but they have not done so. I had thought, I don't know, I had thought cost causation was. The more intuitively simple argument for you, you're, you're pushing, but for cause hard and. I understand that, but I'm a little wary. Like, judge pan of trying to tell. The agency how to structure the studies. Because causation just seems like there's a basic idea even if. Even if you were the, but for cause of. But for cause of a bunch of expenses, right? If the benefits are diffuse. They have to at least take a look at that allocating. I absolutely agree your honor and I think that's another way for the court to rule in our favor. They didn't look at the benefits at all. And I think it's especially striking here because again, the regional transmission line along the eastern border of New Mexico that they assigned to us as part of the preliminary cost assignments once that was actually added to the models later on in the process, it dramatically reduce the cost to a fraction of what they were before. So, clearly, there were regional benefits to the cost that they were it's a high voltage line, right? Correct regional regional benefits. Exactly. That's the old dominion case. So. Yeah, so I don't, I certainly don't mean to push that. We need a ruling on, but for causation, I think you can look at it through. I think before causation is just intuitive because that's really cause. In fact, and they just don't know if we were the cause. In fact, and in fact, they've absolutely admitted again. J. H. 1, 321 never claimed. That the not convergences weren't already there, and I think the other striking quotation I urge you to look at is J. A. 325 when Southwest again, and this answer says, quote, the fact that a contingency causes non convergence in the pre transfer case does not mean upgrades cannot be assigned to mitigate constraints. So, they say, even if there were non convergences in the pre transfer case, and we don't know whether they were or not, that doesn't mean we can't assign the cost to you. And again, that just seems very much a basic cost causation a flaw. Okay, thank you. Next, whenever you're ready.  Angela for the commission. I want to start with judge pan's point about standing. I think that's an excellent point here. You know, the supposed injury of losing their original Q position that was caused, as you say, by their voluntary decision not to pay their study deposit it's, it's, if anything, self inflicted and the other point that judge pan raise on redress ability. I also want to explore that, because not only is this a voluntary business decision, but time has moved on since the original phase 2 study of cage ranch's cluster. It's been years now and from what I understand from Southwest, their cluster study is done the other generators that chose to pay their deposits and stay in the cluster. Their studies are completed, they executed generator interconnection agreements, and they're in the process of building their network upgrades and facilities needed to interconnect and in view of all that's changed with the passage of time. I guess I'm just really uncertain as to what could happen at this stage for cage ranch to obtain their desired relief of their original Q position. I'm not if they paid their deposit and we're still in the study, could they still challenge the phase 2 study? Yes. Yes. If they had that's what they should have done. Then they should have paid their deposit and then brought this challenge. But if they succeeded, you still would have had to redo the study. That's correct. If they had succeeded, we still would have had to redo the study, but your point being that the more appropriate way to approach this would have been to pay the deposit. So you retain your Q position and your continue to be processed along with the rest of the queue and retain your standing. Basically exactly. Challenge that study exactly. So that you're continue to be studied along with the rest of the cluster. At that point, there's something that could be done about refunds. If they happen to be correct on the cost allocation point, et cetera. But also, I do want to note that in this case, after they withdrew from the queue, a restudy was done after the board had approved the crossroads road runner project in July 2022 and therefore, none of the generators that. Paid their deposits needed to were assigned any costs associated with that project. So. As to the improper cost call causation challenges that cage ranch alleges those costs were actually after. Iterative interconnection study, not actually assigned to the generators in its cluster and that does that render anything loop. Or not, because that study is. Gone and passed, you've moved on and it's a whole different set of costs. Is that mootness? I would think that there is some mootness implicated here because the actual costs that they dispute were improper. We're not actually. Assigned to any of the generators and the generator study is done in any case. So I'm not entirely sure what sort of live challenge remains here. But, you know, as to standing, I don't, I believe judge pan is correct that there really are big questions here as to whether cage ranch has demonstrated. There's still relief. That's redressable for them. Why are we hearing about all this for the 1st time now? That's a great question. I will say personally, we have a duty to consider this, but it's a little hard to. Deal with all of this on the fly at oral argument. I take your point your honor. I personally was not aware of how far the phase 2 study, or the original cluster of cage ranch had progressed and in preparing for this argument, learned that fact and agree with judge pan that. With this new understanding of the circumstances, it does seem that standing is more tenuous. So 1 aspect of this is whether the injury was self inflicted. That seems like it's a legal question that goes to standing and. We have to figure that out another 1 is. Um, whether change circumstances with new studies and such. Have affected our ability to. Give relief so walk me through that. That might be a redress ability. Point, but it might also be a mootness point and it's your burden to show mootness. So, what just help me understand what. Where where we are in terms of these studies. Sure. I mean, as to the voluntary decision point, this, the interconnection process is designed to act as a funnel. There are numerous requests that start out in the process. And as we go on with increasing study deposits and withdrawal penalties, those projects that are less certain, make the business decision to withdraw their request. And again, they enter this queue, knowing what the ex-ante rules are, how these studies are conducted, when projects are entered into the model or not. And so, if they're confronted with a cost allocation, that is unfavorable, or that they dislike, it's their voluntary decision, whether or not to put up a deposit in order to continue the process in hopes of, you know, upon further iterative study, their cost allocations will change or to do as cage ranch did here, which is withdraw and, you know, even today, it remains free to resubmit a new request where it could have a different cost allocation. So, that is, in my view, a self inflicted injury of anything, but as to your point, just on that, does it matter how excessive the. Bond is, or the security is? The security, we have to assume the merits of their position for standing purposes and the merits of their position is that. As I understand it is that the flaws in the study make the deposit wildly excessive. The security is 20% of their total assigned costs, but the system is designed that way, given how severe the backlogs are in the interconnection queue. It's designed to pressure generators to make these business decisions earlier in the process. If they felt like the potential risk that a portion of their 60M deposit being under risk was not worth. The cost of their project, then that's an economic decision that they've made other generators refund of the 60M, like, the people who paid in here, and then there was a restudy and it turns out the cost were lowered. Did they get a refund of their deposit? So, I believe Southwest can speak to that more in more detail, but I do think there is some refund at issue here. So, in tariff section 8.14 part G, that's at JA 529. it states that when a generator has made it to the end of the interconnection process, and they execute a interconnection agreement, the financial security amounts they paid are put towards the upgrades that have been assigned to them and towards the construction of those upgrades. So, any remaining funds that are left over will be refunded to that customer. So, in this circumstance, if generators were initially assigned costs associated with an ITP project that is later approved, and then added into the study at a later point in time, their financial security costs will be refunded to them in excess of what it actually costs to build their necessary upgrades. When the decision was made to withdraw or not to not to post a necessary deposit. Had the plant been under construction at that point? When the solar field, whatever it is. When Kedron decided to withdraw, the board had at that point approved the Crossroads Roadrunner project. So it was at that point part of the regional transmission expansion plan and because the interconnection study process is iterative, it would have been added into the next phase of study. And here, that was the October 2022 re-study. That gets to a great point. The question is, in July, I think it was, if it's true, right, had they expended money on construction as of July? No. Okay. So it's purely an ex-ante risk calculation. That's correct. Purely ex-ante risk calculation. But they had noticed that Crossroads Roadrunner, I love that name, that Crossroads Roadrunner had been approved, so perhaps there would have been a refund on their 60 million. That's correct. I do want to also emphasize along with that point, the interconnection process is iterative. So, at the end of each phase, that's a cost estimate based on that point in time, what Southwest believes their upgrades will amount to, but it's continuously being changed in between different study phases. This transmission grid, which is always in flux, new developments are occurring. Those developments will be accounted for in the next phase of study. So, even if at the end of phase 2, a generator is initially assigned cost associated with an upgrade that's contemplated in the integrated transmission process, as long as that upgrade is approved before the next phase of study begins, then that will be incorporated into the study model. And approval came in August. It came in July 2022. Same month in which they withdrew? They withdrew, I believe, in August, so they withdrew after approval came. Oh, I think it was like, August 15th or something. There is a timeline. The draft came out with the costs and then August 29th is when you finalize the costs. I believe that's correct. And there's a timeline in our addendum to our brief on page A3 that lays out the dates of the key events. And the, yeah. Oh, sorry. Finished. That was it. So, suppose just for the sake of arguments, because I think the injury. Is not self inflicted and. They've alleged. Problem with this pre-transfer study. Is this phase 1, phase 2? Phase 2. Pre-transfer study. What's happened in the interim that. Bears on redressability or mootness with these studies. What happened to that study? How has it been overtaken or not been overtaken by events? Just walk me through that. Right? On the redressability point, that's key to the relief that cage ranch requests is the restoration of their original queue position. But that's from my perspective, I'm not sure how that's possible at this point, because, you know, after they withdrew time is marched on and those studies continued phase 2 went into the restudy. Then it went into phase 3, and then the interconnection agreements with the remaining generators were finalized. So I'm not sure that their original queue position even exists anymore. So, we've gone from phase 2 pre-transfer to. We're all the way through phase 3 base pre-transfer transfer. Yes, we're all the way through all of those studies at this point, and the remaining generators that paid their deposits have executed interconnection agreements, which is the end of the interconnection study process. So those costs are final. If they were still in the queue, or we talked about restoring them to the queue, they would have come to the end of the process found. They had no liability for a deposit or 60, whatever a million dollars. The person's the other no one else in the cluster had to pay as well. Right? And so they would go on to an interconnection agreement. That's correct. There would be no further obstacle. They would simply enter into an interconnection agreement and seek its approval. That's correct. So that's the redress. Well, but that's if they had stayed in the queue and had continued to have their requests studied along with everyone else's at this point, though, that the cluster under study is a different cluster and cage ranch's request has not been evaluated along with the other requests. Just stay with the cluster 5. that group was that that evaluation has been completed. Yes, what reason is to think that had there been another. Application in cluster 5 that it would have changed the outcome because cage ranch's request has impacts on the transmission system and there are upgrades that are triggered in response to the impact their request has. So, when they withdrew from the queue, their request, and their proposed generation facility was taken out of the study. So, the impacts are no longer modeled. The costs that other generators in their cluster have been assigned have been in the absence of cage ranch's project. I have a, thank you. So, it just seems to me, like, on muteness. They are asserting that there have been all these errors in this phase 2 study. That study actually didn't even go into what has happened now because there was a restudy. And the process proceeded without them based on a restudy. And so if we were to hold. That there were mistakes in that other study, there's nothing you can do about it. It just seems to be that it's, it's mute because even if they're correct, it has no bearing on. This entire process that has now proceeded. Because there was a restudy that went on without them, so there's nothing to correct because. This whole new restudy happened that actually addresses all of their concerns because it, it lowered the cost by considering crossroads road runner. Yes, that's true. It just seems to me that there's also a muteness issue in terms of, you may be right that there were problems with this study, but it's a study that's been overtaken by events. It's been chopped and now there's a whole new restudy. And so correcting anything that was wrong with that 1st study does nothing at all. Is there any barrier to their simply petitioning again? To to resubmitting a new request. No, there's no barrier. They can resubmit their new request and given the current state of the grid, the cost of the crossroads road runner project wouldn't be. Allocated to them in any way, no telling what would come out of the next study. That's that's true. It's a new cluster. There's. New costs and and there's the time component, because in that intervening time, the grid will continue to change as it always has. But I do want to I know I'm over time, but I did want to try to address the merits. If I could briefly. As to cage ranch's argument that there are 2 variables changing the reason why the contingency analysis is only done on the transfer cases, because running 1 on the pre transfer case would be duplicative aside from the current cluster under study everything else is already studied under contingency through a separate process. So, we think about the study model in 3 parts. There's the current cluster. Then there's the higher queued interconnection requests from prior clusters. And then there's the existing transmission system that Southwest studies annually through the integrated transmission process. 2 of those 3 components are already subject to a contingency analysis analysis in their own separate process. And when I, when Southwest puts together the study model for the current cluster, the network upgrades that are assigned as a result of those other contingency analyses are incorporated into the model. So, higher queued interconnection requests are assigned network upgrades in their own cluster study. And those assigned upgrades are put into the study model. Also, with the existing transmission grid. Under the integrated transmission planning process, the board approves projects, but then, like, is the addition of this cluster group compared to that pre transfer group that includes the. The upgrades, or is it compared to the base case that does not it's compared to the free transfer case that has everything plus all the upgrades that have been assigned through the perspective. Oh, contingency analysis. Then it sounds like there's just a factual error in their argument that you actually are comparing the 3rd phase to the transfer phase. Yes, I think all of the parties in this appeal agree that the purpose of these interconnection studies is to isolate the. Effects of new generator interconnection requests, and that's essentially what Southwest processes does, even though it only does the contingency analysis on the transfer case. It's because it already does a contingency analysis on the other components of the model in their own separate processes, and then incorporates those and incorporates the results into the study model. And I want to point you specifically to, for example, the tariff at 3.8, which is also cited in our hearing order at paragraph 28, it says that before Southwest assigns upgrade costs to the current cluster, it will 1st mitigate steady constraints with network upgrades that are part of the current transmission expansion plan, i.e. the upgrades that come out of the ITP process and also network upgrades that are assigned to the prior queued interconnection requests from earlier clusters. And I also want to refer you to tariff section 8.4.1 on 518, which similarly talks about that process of incorporating those network upgrades. As to the timing of the crossroads Roadrunner approval, that project was not approved until July 2022 and it's necessary for this interconnection process to have these strict cutoffs and rules because the grid is constantly in flux, constantly changing. There has to be this line that we draw that says, no more changes added to the study. We have to stop at this moment in time and just run the study. And that's exactly what the rules work out to here. It's true that sometimes we'll see these edge cases where things will look a little more difficult, but the overall process that's guaranteed by these rules are fair. They make sure that customers can proceed through their interconnection studies without holding these studies open for further changes. And it also respects the iterative nature of the interconnection process, because changes that aren't incorporated into 1 phase can make it into later phases. With that, if there are no further questions, does FERC regard the but-for inquiry as sufficient to satisfy cost causation? It seems to me you've taken some, you, the agency, taken some shifting positions on that over time. Yeah, so, yes, I believe the agency's position is that in the interconnection context, the commission uses but-for cost causation to satisfy the cost, to satisfy cost causation principles. And that stems from order number 2003, which is also cited in our brief, where the commission determined that the cost causation principle requires interconnection customers to initially pay the full cost of the network upgrades that would not have been needed, but for their interconnection request. And here, that principle is satisfied, because at the time that the Phase 2 study began, the Crossroads Roadrunner project had not been approved, nor had any other project in that area. And so this study model, which is necessarily a snapshot in time, under that model, it was Cage Ranch's request that was the but-for cause of its assigned upgrades, regardless of what happened several months later, after the study was already nearly complete. Suppose the upgrade has diffuse, they are a but-for cause, but the upgrade has diffuse benefits for the grid. Do you account, how do you account for the latter? So, this is more of a policy decision from what I understand. I think it could be argued that for any interconnection upgrade, there is some diffuse benefit to that upgrade. But the commission, from what I understand, has decided that cost allocation in the interconnection context should work in the but-for causation framework, because the existing load on Southwest Grid, they've already paid for all of the facilities that exist on the grid. And new interconnection customers will come in, and they won't have to pay for any of those facilities. So, what the commission has decided is, if it respects the cost causation principle, is to have new interconnection customers pay just those upgrades that are necessitated by their interconnection onto the grid. My understanding of TANASCA's read on this is that in this context, where there is an interconnection request, basically. An operator like Cage Ranch says, let me join your grid and the but-for causation is. The cost for you joining our grid is the cost of these upgrades that we have to make in order to have you because it's but-for. That means that if you weren't asking to join our grid, we wouldn't be doing any of this stuff. And so the primary beneficiary of the upgrades is the requester because absent the requester. There would be none of these upgrades. It's a but-for thing. So, TANASCA seems to say that it's unlikely that there would be diffuse benefits that need to be allocated to other people in this particular factual. Context, because the upgrades are because this operator has asked to join the grid and so they are the primary beneficiary. That's exactly correct. At the time that the study is done, the but-for cause is the generator that is the primary beneficiary, because these are upgrades that would not have been needed, but for their request, and they benefit by being able to interconnect reliably to the grid. And on that point, I just want to make a final note, which is the interconnection grid, there can be concerns identified on the grid that Southwest monitors over years. But for cost causation, there needs to be a tipping point that's reached before an actual upgrade is needed. And whoever is responsible for reaching that tipping point is who pays for the upgrade. That's the system that the commission has adopted for the interconnection generator context. If there are no further questions. I just want to point out that the company cites 2 cases allegedly to the contrary about system benefits, but neither of them is an interconnection case. That's correct. None of those cases are in the interconnection context, which the commission has decided to use a very different cost causation policy. Thank you. Thank you. Good morning. Thank you, your honor. May it please the court. Matt Bennett for Southwest PowerPool. I'd like to begin with this whole, but for cost causation issue, there's a couple of things that I think need to be pointed out. 1 is. Um, but for is sort of a way to implement the cost causation principle. And what it does is it limits the responsibility of the generator to pay only for the upgrades that they are directly causing. So, they don't pay anything for the existing grid. They don't pay anything for new upgrades that arise out of the integrated transmission plan, which is regional planning process. They only pay for those incremental upgrades that were identified by SPP as necessary to connect their generator to the grid. I'd also like to point out that the project that was actually assigned preliminarily to Cage Ranch is a different project serving different needs than the project that was approved through the regional planning process. So, the way SPP looks at generator interconnection, we look at years 2 and 5 in the study. The integrated transmission process looks out 10 years. The reliability needs, if you look at the integrated transmission plan, which is in the record, the reliability need for the crossroads road runner project doesn't arise until 2031. The reliability need that is caused by the addition of the group 5 projects in the phase 2 study actually arises in 2026. The reason the project was approved as part of the 2021 ITP to be part of the SPP transmission plan in 2022 is because that particular project, the crossroads road runner project, also provided additional economic benefits. So, when we're looking at a project, we're looking at multiple things. Is it fixing a reliability problem? Can it provide economic benefits? Is there a public policy reason for including that project? This particular project was approved earlier than it probably would have been if we were just looking at reliability, because it provided additional economic benefits. Those are not benefits that they are paying for. Those are not needs per se. They're called needs in the planning process, but it's really, does it provide a benefit? So, the idea that these were the same projects is just not true, because what we assigned to them was a more limited project to address a reliability need caused by their group during the 2026, I think it was summer. So, it's 2 different projects. I'd next like to talk a little bit about the, why does interconnection. Matter to justify a. Very different approach to cost causation. If we were not in interconnection, right. I'm not an expert either, but I have old dominion in mind, which I. Just remember, right? 1 utility in the grid wants to do this upgrade. It's a high voltage line. It has regional benefits. And the costs would be allocated throughout. The grid and passed on to generators or customers or whoever. Because I voltage lines have regional benefits. Why does that principle vanish? In the interconnection context, because has asked us to only. Assess cost to generators that are caused by the needs that they create on the system. So, yes, while as a general proposition, the 345 kilovolt line could have broad regional benefits. It doesn't mean it always does. If it's causing, if they're causing a problem, might or might not, it might or might not. That's the cost causation question. You would normally look at, but there's, there's no evidence in the record that the project that was actually assigned to them, which was the crossroads to any project. Has regional benefit. It was never assessed for a regional benefit. They didn't provide any evidence that it provides regional benefit. It is put in place to address an immediate reliability need caused by their interconnection. It is not looked at. It was not looked at more broadly. What happened is events overtook that project and determined that there was a different project, the crossroads to road runner project that we could justify for regional cost allocation on a basis that that project. Does provide diffuse benefits. It provides congestion relief put aside the later studies. I need to work that through. Sure. In my own mind, but the reason why. The reason for the. Decision under review is legal position that, but for but for causation is suffices as a matter of law to establish cost causation. Right for generator interconnection generator. Yes, because when a generator seeks to interconnect to the grid. That's a voluntary choice on their part. Doesn't mean that the grid needed the power. Doesn't mean that that generator is the right generator to serve load. It just means that they want to connect to the grid and have an opportunity to participate in the market. So, there's no guarantee that the upgrades that they are causing actually have regional benefit, which is, I think, why for segments it into interconnection versus general regional transmission planning, because. We have to have an open door that anybody who wants to. Determine whether they can connect, we have to let them, we have to at least let them into the study, tell them what it's going to cost. And I think has really drawn that bright line. I think another point to make is that these are all. It doesn't necessarily mean the upgrade will have. Regional benefits, but it doesn't necessarily mean that it won't. It doesn't, but there's no evidence in this record that that particular project does, because ultimately what was approved was a different project. I think you also say that they didn't. They didn't claim regional benefits, but they did not. They did not demonstrate regional benefits because they did. They even reports that have them. I think they claimed in their brief, but I don't recall them claiming at that this project provided broad regional benefits and they certainly didn't put in any evidence. No, but didn't say. As a factual matter, no regional benefits, therefore. Just assign all of the costs on a, but for basis. They said, but for cause is all that we care about. We're not. Well, I think it's also important to realize that when we talk about interconnection upgrades and but for costs. They are fronting the costs, but they actually get paid back over time. That's a policy in order 2003. I think it's paragraph 694 to 696 of order 2003 that says, once they connect, we have to pay them back. So, at the end of the day, they're not actually paying anything to interconnect. Sorry. We Southwest the RTO. Yes. Okay. That's not just through their. Approved rights, so the way it works in an RTO context is we give them what's called congestion rights, long term congestion rights. And then what happens is in the market. The SPP market sets a price for congestion, which is basically the difference in cost to transmit power from point A to point B and for their, for the upgrades that they provide to the system, we have to provide them an opportunity to get that revenue. And that's a long term congestion, right? And that's a requirement. Like I said, it goes back to order 2003. so it's it's a rate. It's in the rates that they, in the tariff that they file. I'm sorry, it's in the rates that they seek. They being SPP, or they be yes. Yes. Coral ranch. No, yeah, it's it's in the SPP tariff that we will give them long term congestion rights to reimburse them for fronting the cost of these upgrades. So, when you look at, when you look at it in the totality generators, ultimately end up not paying. To connect to the grid, because they're only fronting the costs because these are costs that other. Members of the RTO didn't necessarily want to incur. Because if these were costs that were seen as beneficial to everybody, they would have been included in the regional plan. So, that's really kind of where I come out on the cost causation, but for principle is. Ultimately, the load is going to end up paying for everything. It's just the timing of when the money comes in. And if I could just quickly, I'm sorry factually on this this point, because as I was looking at this record, I was a little bit confused about it, but it seemed to me that. If there had been an argument that the benefits of the crossroads road runner. Addition were actually being assessed in the, but for causation thing, then they would have something because. If you were going to do that anyway, or if the, uh, the system needed the crossroads road runner thing, assume it wasn't an economic thing, but a reliability thing, then they would have a claim that they were being unfairly. Assessed something with broad regional benefits or or whatever, but it seems factually. That's not the case and instead what they were being assessed was this. Crossroads Eddie thing, which didn't benefit anybody, but them. So, factually, there is no diffuse benefits to what they were being charged, even though theoretically they could have had a claim. If crossroads road runner, we're being assessed to them when it turns out crossroads runner, it appears benefits everybody. I think that's potentially true. My only reason for quibbling with that is when did the need for the crossroads road runner project come in? And if you're just looking at it from a reliability perspective, we don't need that project until 2031. So, if they want to connect to the grid, their, their requested commercial operation date was December of 2023, but just diffuse benefits depend on that. On the timing, because it turns out that when. If you were going to do it anyway, it was going to benefit a lot of people. Well, it does. It does depend because by 2031, the grid may look entirely different and we may no longer have that reliability need. That's why we do these studies every year. And that's why we do these studies. Sequentially, so there's a, there's a possibility that by the time that project was needed for reliability, it's no longer needed for reliability, but I will say in this situation, there was also the economic benefit, which is what justified it being approved earlier. And that situation, I would agree if we were to, if we were to say, you have to pay for crossroads road runner. We would be actually violating our tariff because once a project is approved in the regional plan, we remove it from the interconnection process. When I say we remove it, what I mean is, but what if, you know, you're going to approve crossroads road runner. But at the moment in time in which you're issuing phase 2 interconnection study, it hasn't been approved yet. Do you take that into account? Or are you supposed to? No, no, we don't take it into account until it's actually approved by the board of directors. And that does get to everybody participating knows that it's. Possibly going to be approved, so everybody knows that that's a possibility. Well, everyone knows it's being considered. If you look at the joint appendix. There was actually a dispute as to whether this project had the needs that. SPP had indicated that it had, I believe it's I don't have the site in front of me. Yes, it's a 174 foot, not 5, where it basically notes that there are members of the transmission working group, which is 1 of the underlying stakeholder groups that. Disputed whether this project was needed. So while, yes, it was that was crossroads phantom, which is a whole other project. That's where we kind of get. Yeah, you kind of have to draw a flow chart to figure all this out. I understand, but that was crossroads phantom, which was sort of the predecessor. If you will, what ended up being crossroads road runner, which is a different project than again from crossroads phantom. So, but, but the tariff is also designed to protect generators from additional costs because once the project is part of regional plan, they no longer pay for it. It's factored into their studies, and that's what happened here as pointed out is when we did the restudy on phase 2, which we had to do, because among other generators cage ranch dropped out, we have to do a restudy when when people drop out of the queue, because that's going to change the dynamics of everything that's going to change. You know, their demand on the system that's going to change power flows and everything that project effectively relieved some of the issues that were being caused by that group. So. By withdrawing from the process prematurely, they did not benefit from having that project from which they would benefit, but would not pay to be considered as part of the cost that they are assessed. If I could, I know I'm well over time, but I just, I just want to talk just briefly on the addressability issue. Just the 2017 clusters done studies are done interconnection agreements are signed people are building transmission orders are building upgrades. I don't see how it's possible to reinsert them into that. Not only that, 20, 20, 20, 18, 2019, 2020 and 2021 are done. 2022 and 2023. Are past phase 2, which is the phase where they dropped out. So I don't see how you can possibly redress their grievance by restoring a queue position that just simply does not exist. There's no queue anymore. There's no queue. Right? Right. So, I guess it's a question for your friend on the other side, but I hope that they try to get into a cluster. Group in the meantime, didn't wait for this whole process to play out before doing that is do, you know, whether they've tried to get into another cluster group? I don't know if they've tried to typically. Until studies are done, SPP treats who's going into the study. Confidentially is for business reasons to protect the generator. So I don't know if they've tried. I know that their next opportunity will be to enter in 2026 to be studied and the grid is obviously very different than it was in 2017 when they 1st entered their request. So, thank you. Thank you. Thank you, your honor. I'll try to make a few brief points. I'll begin with standing. I think I understand this court has to assure itself of its own jurisdiction. Of course, but I do think it's telling that has never raised any of these arguments until oral argument. Obviously, that puts us in a position where we are trying to do this on the fly. If you look at page 23 of our brief, we asserted very clearly that we have harms, clear harms from having to pay 60Million dollars and that risk security that we would forfeit if we didn't do this on the fly. If they don't didn't fix the study in which we had identified very clear problems, and those harms would be redressed by a favorable ruling for this court, which would restore cage ranch to its Q position for not to speak. There's no Q. anymore. There is still a Q. your honor. The study process has been complete, but the Q can be reopened at any time. In fact, in the case, that is exactly what happened. The Q process had the study process had been completed and. Uh, construction was actually already underway a generation interconnection agreement bites and ask had already been signed. The Q was reopened, restudy occurred, and they were assigned additional costs. That's why they came to court. So it's not the case that this is unreviewable. And again, tried to enter other clusters. In the meantime, it is not because it doesn't need to your honor. It should be in this cluster. This was the cluster. It should have been in until it was kicked out by what if you lose. Then it's lost its opportunity, but that was the risk it was willing to take. And I think that goes to the, the, the risk point you were talking about earlier where it's, you know, it's a meaningful step in the process. And that's why we're injured. We were asking being asked to pay 60Million dollars that made the project on economical at that time. And so we took a risk. We said, we either going to win this case and we get back to our Q, which is 60Million. Well, Southwest has said that multiple times. They don't cite anything in the brief for that. I've talked to my colleagues and we don't, that's not the case. As far as I understand it. We don't believe we get reimbursed those costs. So I'm not really even sure what they're referring to. And I'm not sure how you would resolve that on this record, considering they don't cite anything for that proposition. So, I don't actually think that's the case. This is money, 60Million dollars that made the project on economical for us decision refers to it more than once as reimbursable. It refers to that your honor, but again, I'm not, I'm not again, it hasn't really been briefed in this case. I'm not really sure what that refers to. So they say reimbursed, maybe reimbursable through rates over time. I think that's the very least. What it means is right, but I don't know if that is some formal process or simply, you know, we get paid back by our normal rate making process. But again, that's, you know, it's a different use of reimbursable. I would think, considering we're being asked to pay 60Million dollars. I guess there's a real reason for that. 60Million dollars. It's a lot of money, but it seems just as I sit here, listening to the arguments today that. It's important for FERC or Southwest to understand who's in and who's out because all the decisions are made based on who's in and who's out, then they decide what upgrades they need. Then they decide how to allocate the different costs of these upgrades and all of these things. So it seems that. A company in the position of your client needs to pay their 60Million stay in. Keep your appeal of the study intact and then if you win, at least you're in and all the subsequent stuff accounts for your draw on the grid, but then it's just a question of money and figuring out what they owe you. So, it just seems like an untenable process that you're proposing, which is that you can just refuse to to be in don't pay your, your deposit and then come in later when it's just really difficult to get you back in. But if you had stayed in, you would have either gotten a refund or, or we would have turned out to work out for you and the restudy, or we could be at this point, you could be building your, you could have entered a contract and be building your thing. And you'd get some kind of a refund, but now it's just really hard. Well, your honor, or we would be. I think there's a 3rd possibility. You're not considering, which is that we would be saddled with paying 60Million dollars for in an uneconomical project, but you're 60Million always gets. Gets credited to what you pay later. That's well. Of if we were asked to pay 300Million, but we load a tiny fraction. No, but if you, if it turns out at the end of this process, you're asked to pay 20Million, you would get a refund of 40Million. Correct. But if the process had completed, and they said, actually, you 100Million, then we would have had to pay even more for an economic. That's just part of being part of this process, which sounds like it's very dynamic, but it sounds like we can't really then meaningfully challenge legal errors if we're being asked to put at risk security, that is, is forfeitable completely, but it just seems that there's a lot of. There's a real reason for that, because they need to know who's in in order to do all this planning. And it's not just you. There's like, all these other people in the cluster. So, for you to say, well, I'm not going to pay my deposit and now late in the game, I should be able to come back into the queue, scramble this whole process, put everybody back to phase 2 when they've completed the process just because you didn't want to pay your 60Million rather than speaking hypotheticals way to proceed rather than speaking. I'll point you to J351 footnote 43. We cite half a dozen cases there, for example, Florida Municipal Power Agency, 167 FERC, 61, 138, acknowledging that reinstatement of queue position and reordering of queue appropriate remedy for remedying unjust, unreasonable or unlawful practices, we cite Edison Mission Energy, we grant Edison Mission's complaint and direct MISO to reinstate the queue position of any group 5 interconnection customers. The list goes on. I'm just saying, I take the points you're making hypothetically, but the fact is FERC does this all the time. This is not an uncommon situation. And in fact, we said in our opening brief on page 23, these harms are redressable. They can restore the queue position. FERC did not contest that. So, it seems to me that they can move mountains to accommodate what you're asking for, but I don't know why they should have to when you could have just paid your deposit. Well, that's just the way that FERC practice works, Your Honor. It's the way the tariff itself contemplates. It says if you've been withdrawn from the queue, that's section 3.7. But if you know that this is how FERC practice works, you know that you're taking a risk by not paying your deposit. But we don't think that's – Because letting you back in the queue is ultimately discretionary and based on four factors, which you already conceded. Well, again – So, you might fail on the four factors. No, I don't think so, Your Honor, because the tariff itself contemplates restoration as long as you do those factors. That's tariff section 3.7. No, no, it's still discretionary. You don't have to be restored to the queue, right? I think there's two separate issues. One is whether we should have gotten a waiver, and a second is whether this court has remedial authority through making the orders. But, again, rather than speak in hypotheticals, I urge you to look at those cases. I would also suggest, Your Honor, especially given that mootness is their burden, at a bare minimum, if we're going to resolve the case on this ground, which was not raised by them at any point, the court should ask for supplemental briefing or even now have it offered if you'd like to see something on this. I just think that would be an unjust way to end this case, considering they had ample opportunity to say there was no remedial authority and didn't do so. Another quick point I just wanted to push back on FERC's point that somehow these had already been studied. They do not use the transfer case from the 001 cluster to test the 002 cluster. We know that because they use different studies. Page 8 of our reply brief, we point out that they start with a different baseline model, 2021 model for our cluster, 2019 for the prior cluster. So there's just no basis to say that the testing has been complete. Finally, on the system-wide benefits point, Your Honor, I do think that's a critical point. These are high-voltage lines that have system-wide benefits. If you look at page 14 of our brief, we have a map. And if you look closely, you kind of be a magnifying glass, but if you look closely, you can see the different grid, the areas where this transmission line is going to be built. All of the projects we've been referring to today, the Crossroads Eddy Project, the Crossroads Phantom Project, the Crossroads Roadrunner Project, they're all obviously involving crossroads, right? It's all the same area of the grid. They're just different. The transmission process is trying to figure out where exactly are we going to put that? Are we going to connect three lines? Are we going to connect this way, this way, or this way, and this way? So it's true that at that time of the transmission process in February, they had not approved the specific project they ultimately approved. But what they had said was that it was a multifaceted problem in that region. That's JA218, JA235. The area experiences thermal overloads and insufficient voltage support, leading to voltage collapse. So this, I think, goes exactly to, Judge Katsas, your points, that if you are going to have a rule that says cost causation is but-for-causation only, then you really do need to test but-for-causation. You cannot then assign costs based on grid problems that preexisted our connection. If you're going to take a broader view of cost causation and say it incorporates both but-for-causation as well as benefits, well, then maybe you have a little more flexibility there. And I think, again, I think Old Dominion is critical on that point because that shows that these were really regional costs and problems that should be fixed regionally. Thank you. Okay. Thank you very much. Thank you. Case is submitted.
judges: Katsas; Pan; Ginsburg